## *In re* Accounting of BARNES, Assignee of Vetterlein & Co.

*(District Court, S. D. New York.   October 8, 1883.)*

1. BANKRUPTCY—ASSIGNEE'S ACCOUNTS—BOOK-KEEPER.

    On an assignee's accounting in bankruptcy, charges for the employment of a book-keeper will not be passed beyond what is proved to have been necessary in the administration of the estate, nor for a longer period than the exigencies required.

2. SAME—RENT.

    Where charges are made for a book-keeper employed partly in the personal business of the assignee and partly for the estate, no apportionment of charges by the assignee will be approved, except upon proof of the services rendered, their necessity, and reasonable value.   And the same rule applies to rent for offices used for both purposes.

3. SAME—QUANTUM MERUIT.

    Where a separate office, or office privileges, are proved to be necessary in the business of settling a bankrupt estate, and such office room is furnished in a building of which the assignee is landlord and owner, he may be allowed, on a *quantum meruit*, the reasonable value of such room as is proved to have been necessary, for the necessary period, subject, however, to the jealous scrutiny and suspicion which attach to such a claim by the assignee in his own favor.

4. SAME—REMISSION PROCEEDINGS.

    It is not the duty of an assignee to litigate legal demands in the interest of one set of creditors against another; and where a legal preferred demand in favor of the United States against the bankrupts, as a forfeiture for the value of goods fraudulently imported by the bankrupts, has been allowed by the district and circuit courts, any application for remission should be at the expense of the general creditors interested.

5. SAME—ORDER OF COURT.

    An order from the court for the payment of certain disbursements in such proceedings having been obtained, the disbursements made were passed in the assignee's account.

6. SAME—ATTORNEYS' CHARGES.

    The attorneys having charge of the proceedings in behalf of the assignee were bound to take steps to procure indemnity from the general creditors, in whose interests the remission proceedings were instituted by them, before incurring large expenses therein; not having done so, and the proceedings being fruitless and without benefit to the estate, *held*, neither they nor the assignee had any claim for their services in the remission proceedings, as against the fund.

In Bankruptcy.

*James K. Hill*, for the assignee.

*Samuel Clark*, for the United States.

BROWN, J.   In determining the exceptions arising upon the report of the special examiner on the accounts of the above assignee, I find it impossible to reach any satisfactory result.·   The difficulties attending the administration of this estate through nearly 13 years have been extraordinary; the necessary expenses seemingly intolerable; and to these are added further claims, which are clearly inadmissible as they stand, but which cannot be wholly disallowed without evident injustice.

The assets collected, exclusive of interest on deposits, have been about $114,000.   The collections were all made, except about $7,000, prior to January 1, 1873, or within less than two years of the assignee's

appointment. Of these collections about $34,000 were ordered distributed by a dividend among the general creditors in September, 1871, prior to the presentment of the claim of the United States. The claim of the latter, amounting to about $100,000, for the value of property forfeited by the bankrupts through frauds in importations several years before the bankruptcy, was presented in 1872, and adjudged a legal demand by the district and circuit courts, and would absorb all the residue of the assets. A payment of $3,000 on account of this claim was ordered and paid in 1882.

By the assignee's accounts presented to the special examiner all the residue of the estate, however, above the two sums above paid, or ordered paid, would be absorbed in the expenses of its administration. Some further collections are expected to be made from several life-insurance policies adjudged to belong to the estate; but these cannot swell very much the aggregate amount realized from the estate; and from the policy on the life of T. H. Vetterlein it is doubtful if as much can be realized as the estate has already expended in keeping it alive, and the wisdom of the course adopted, and of the orders allowing the payments to be made upon it, may well be questioned. *In re McKinney*, 15 FED. REP. 535. Deducting these and other similar advances for the preservation of the estate, there remain some $80,000 of charges and allowances asked for in the assignee's account upon collections which may possibly reach $130,000, besides interest. Difficult and extraordinary as this bankruptcy has been from its inception, it does not warrant any such excessive proportion of expenses to collections as would arise from an allowance of the charges claimed.

The main large items making up the bulk of this amount of expenses are:

(1) The fees of various attorneys in New York and Philadelphia, about - - - - - - - - $25,000
(2) For Mr. Sharp, as book-keeper, 13 years, about, - - 16.000
(3) Rent of offices, 13 years, about - - - - 6,000
(4) Extra allowance asked for assignee, - - - 24,000

Of the remainder, some $4,000 already paid, and $2,000 not yet paid, were incurred in the endeavor to procure a remission by the secretary of the treasury of the claim of the United States above referred to. Of the first three items, more than three-fourths have been incurred since January 1, 1873, during which period only about $7,000 have as yet been collected; while upwards of $105,000 was collected prior to that time. There have been several attacks by suit against the assignee, involving, it is said, the entire assets in his hands, against which it was necessary for him to defend; and most of the collections were obtained through suits in one form or another; so that the estate has thus been kept in perpetual litigation, not merely in the enforcement of the rights of the assignee against others, but in self-defense against unfounded claims.

In the careful report submitted by the special examiner he has allowed the attorneys' bills without reduction. For the item of book-keeper he has allowed $7,500; for rent, $650, during the first 13 months only; and he has not recommended any extra allowance to the assignee; making a reduction in the gross amount claimed of $34,275. Both the assignee and the government have excepted to the report: the former for the disallowance of the amounts charged in the first three items above stated; and the government for the allowance of certain portions of attorneys' fees.

1. It is impossible to justify the employment of Mr. Sharp as a book-keeper, at a large expense to the estate, during the long period of 13 years, as claimed. There was nothing sufficient to warrant his long retention at such an expense. After January 1, 1873, little remained to be done in the ordinary business of a book-keeper. The collections were already chiefly made. The extraordinary litigations which followed doubtless required the frequent services of Mr. Sharp, or of some competent person, as an expert to examine the books, and to testify in the various causes. In the remission proceedings, also, Mr. Sharp doubtless rendered services of a most laborious and painstaking character. These purposes, however, are not, in my judgment, sufficient, with the little ordinary business of the estate remaining after January 1, 1873, to justify the continuous employment of a book-keeper during 10 years following at a constant salary of $1,200. During most of this time Mr. Sharp was also employed in other business in which the assignee personally was interested; and the charge of $1,200 is an apportionment of his salary made by the assignee by a general estimate, upon *data* which do not sufficiently appear to make it possible for the court to sanction it. Charges in gross, made in this manner, for the services in part of a person otherwise employed by the assignee individually, cannot pass in that shape, and can never be allowed, except upon proof of the services rendered, their necessity, and their reasonable value.

From the entry of October 17, 1871, it appears that Mr. Sharp's services began June 28, 1871, at the rate of $2,000 per year; and there is nothing indicated by the debit and credit sides of the assignee's account, or in all the explanatory evidence, from which I am satisfied that it was necessary to continue his services at such a salary beyond the end of December, 1872, a period of 18 months, which, at $2,000 per year, would amount to $3,000. In allowing $7,500 for Mr. Sharp's entire services, the examiner has, in effect, allowed $4,500 for subsequent services,—a liberal amount, as it seems to me, for everything which the proof discloses; and to reach this sum, at least $1,000 or $1,500 must be charged to the account of his services in the remission proceedings. The same remarks apply in part to the charges for rent. The sum of $1,300, charged by the assignee for the first 13 months at the rate of $100 per month, is an apportionment made by the assignee of a larger sum paid by him

for offices which were in part used for his own business, the rent of which was "equated" by him, as he says, according to the space occupied by each; but neither the whole rent paid nor other sufficient *data* are given in evidence, from which the court can see whether the apportionment made was proper or not, and it must, therefore, be disregarded, and only such allowance be made for rent as the evidence shows to have been necessary and proper for the uses of the estate.

2. Where an office or office room is actually necessary for the business of an estate, I think an assignee, who, as landlord, having premises to let, has used any of his own premises for office purposes in addition to what he was otherwise using in his own business, may be allowed a reasonable compensation for such rooms as are proved to have been necessary, and for so long only as the necessity exists. If the case is such that he must otherwise have rented office room from others, I think he may charge the reasonable value of what he has saved the estate by furnishing office rooms in his own building. But as such an arrangement involves a dealing with himself in a double character, *i. e.*, as a trustee, and as a private individual having opposing interests, no contract made by himself in these conflicting capacities, and no charges made by, or vouchers given to, himself, have, in themselves, any legal force or validity; he can recover only on a *quantum meruit*, and the burden is upon him to prove clearly, and under circumstances which the law declares, and which general policy requires, shall be regarded with suspicion and jealously scrutinized, the necessity of hiring the rooms furnished by him, how much room was necessary, whether adapted to the requirements of the estate and not unnecessarily expensive in character, how long the necessity existed, and the reasonable value. I am satisfied that all the office room and privileges required for the uses of the estate, and of suitable character, could have been obtained during the first 13 months for the sum of $650, which the examiner has allowed, and that $300 for the following year, and $250 per year for the remaining 10 years, would have procured all the suitable room and privileges which the necessities of the estate required, and that those amounts are all that should be allowed to the assignee for such privileges in his own building.

3. Considering that the debt of the United States had been adjudged a valid claim against the estate by the district and circuit courts, it is not without difficulty that the large charges and expenses which the assignee incurred in subsequently attempting by the remission proceedings to get rid of that claim can be allowed. These expenses, with what must be included for Mr. Sharp's services, as above stated, amount to about $6,500 or $7,000, if the unpaid item of $2,000 for attorneys' fees be also included. Conceding even that the remission proceedings were in the nature of an appeal to the equitable powers of the secretary of the treasury, the question was not one in which the

assignee as such had any direct interest. The claim of the United States had been finally adjudicated as a legal demand against the estate by the district and circuit courts.

The question of remission was one in which the general creditors, as the persons to be prejudiced by the preference to the United States, should its claim stand, were the only persons concerned, as respects the assets of the estate, and they were the persons, therefore, who should have borne the burden of any litigation which was necessary in their interest to set the claim of the government aside. It is not the ordinary duty of an assignee to litigate and resist by successive appeals one set of creditors' claims in the interest of another set of creditors. The creditors themselves have the right to take all necessary legal steps to protect their own interests against other creditors whose claims they think should be disallowed. And when it is perceived that further proceedings for relief against a legal but inequitable demand (such as this claim of the United States for a forfeiture, above $5,000 or $6,000, clearly was, since it resulted in no punishment of the guilty bankrupts, as the statute intended, but in sheer robbery of their creditors, who were innocent) is likely to involve a large outlay for the benefit of the general creditors, it is the evident duty of the assignee either to obtain the express order of the court, on notice to the creditors, allowing such proceedings at the expense of the estate, or else to obtain indemnity from the creditors for whose interest the proceedings are taken. At an early stage in the remission proceedings it was evident that the expenses would be large. It was protracted through four or five years, and in the end unsuccessful. In effect, the United States, the successful litigant, is now asked to pay, not only all the necessary disbursements, but some $3,000 fees of attorneys and counsel in an unsuccessful effort to set aside their legal demand. All these expenses have been paid by the assignee, excepting $2,000 charged by his attorneys for their own services. The charge itself is a light one for the time and labor expended in these proceedings; and, if they are in a position to claim compensation, they are doubtless entitled to at least this amount. The assignee no doubt acted in good faith upon the advice of his attorneys. But the attorneys were the responsible advisers of the assignee, and had charge and direction of all the proceedings. Before going far in such expensive litigation they were bound to take measures to protect the estate from any considerable loss in case of failure, by obtaining indemnity from the general creditors in whose interest alone the proceedings were conducted, unless the court should authorize the proceedings to go forward at the expense of the estate; and having neglected these precautions, and thus involved the estate in a fruitless litigation at large loss, they are in no position to claim compensation for their own services in that proceeding, but must be regarded as prosecuting at their own risk; so far, at least, as their own compensation is concerned.

If the court, looking back, could see that it might possibly have ordered the remission proceedings to have been prosecuted at the expense of the estate, it might justify it now.    But no such order, it is believed, could have been granted.    The order of Judge BLATCHFORD, reciting that it was "a proper case for an inquiry as to remission," had no reference to the question at whose expense such proceeding should be had, and furnished no authority or excuse for incurring large expense without first obtaining indemnity from the general creditors, for whose benefit alone the proceeding was taken, or, upon their refusal to give it, for not abandoning the proceeding.    A subsequent order did, however, authorize the assignee to pay certain disbursements, and upon this ground I pass the disbursements already paid.    The charges for service of the attorneys, whose duty it was as the responsible advisers of the assignee to protect the estate from loss, cannot be allowed.

4. The exceptions also taken by the government to the attorneys' charges on the accounting must be in part sustained.    The accounting was first directed to be had before Register Allen in December, 1879, where full opportunity existed for all the proof necessary to sustain all just charges of the assignee and his attorneys.    That proceeding was pending before the register 16 months.    The government excepted to their claims, and they put in such testimony as they were advised, both being examined.    The attorneys then claimed $250 only on the accounting, and that has been allowed.    But when the report was filed, the testimony was found to be so vague and general that the court was unable to determine the claims and exceptions presented; and in January, 1882, a further reference to a special examiner was thereby made necessary, upon which an additional sum of $1,285 is charged by the attorneys, besides a considerable sum as fees of the examiner.    Had the accounts and charges been properly authenticated and proved before Register Allen, as the assignee and his attorneys were bound to establish them clearly and in detail, when excepted to, it would have involved only a comparatively small additional expense, and the subsequent proceedings would have been avoided.    The proceedings before the special examiner, also, have been unjustifiably prolonged, and marked by great prolixity and repetition of vague generalities, caused largely, no doubt, by the great delay in the accounting; no attention to the law as to quarterly accounts having been given.    I can allow, therefore, but $250, in addition to the amount allowed before the register for all services of the attorneys, in connection with the assignee's accounting up to and including the entry of the order hereon.

The other items excepted to, which are of a general character, should, I think, be allowed.

Considering the peculiar and altogether exceptional character of this bankruptcy, it seemed to me a case in which some additional compensation might be allowed to the assignee; but upon submission

of the question, together with all the proofs and arguments to the circuit judge, as required by rule 30, it is not considered that the circumstances are of such a nature as to authorize a special allowance.

The opinion of the circuit judge states the reasons for this conclusion.

An order may be entered passing the assignee's accounts as allowed by the special examiner with the above modifications.